IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YIMOE N. SIDDHA,

   Plaintiff,

   v.

GOVERNOR LARRY HOGAN,
ANNIE D. HARVEY,
  *Commissioner of Correction*,
WARDEN GREGORY A. WERNER,
CHAPLAIN GARRY L. FELTON II,
OFC. MICHAEL WILSON,
KELLY PARTLOW,

   Defendants.

Civil Action No.:  ELH-21-2131

**MEMORANDUM OPINION**

On August 20, 2021, self-represented plaintiff Yimoe N. Siddha, a prisoner committed to the custody of the Maryland Division of Correction and confined in the Maryland Correctional Institution Hagerstown ("MCIH"), filed this civil rights action (ECF 1), with exhibits.  His motion to amend the suit (ECF 8) was granted by Order of February 4, 2022.  ECF 18.  Given the nature of the amendments, I shall consider both submissions collectively as the "Complaint."  In sum, Siddha asserts that his First Amendment rights to practice his religion and to access the courts were violated by defendants.  ECF 1; ECF 8.

In response, defendants Governor Larry Hogan; Commissioner of Correction Annie D. Harvey; Warden Gregory A. Werner; Chaplain Garry L. Felton II; CO II Michael Wilson; and APR Coordinator Kelly Partlow filed a motion to dismiss or, in the alternative, for summary

judgment.  ECF 22.[1]  The Motion is supported by a memorandum (ECF 22-1) (collectively, the "Motion") and exhibits totaling hundreds of pages.

Siddha opposes the motion (ECF 26), with exhibits.  He also seeks a permanent injunction (ECF 15), a "Mandatory Injunction" and "Civil Mandamus" (ECF 25), and moves to strike defendants' motion for extension of time.  ECF 24.

No hearing is necessary to resolve the matters pending before me.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons that follow, the claims against Governor Hogan, Commissioner Harvey, Warden Werner, and Partlow shall be dismissed.  And, I shall grant summary judgment in favor of Chaplain Felton and Officer Wilson.  Siddha's motions shall be denied.

## I.      BACKGROUND

### A.      Complaint Allegations

Siddha is a "Black Sunni Orthodox Muslim."  ECF 1 at 4.  On December 7, 2020, he requested a Halal diet from Chaplain Felton.  *Id*. at 3.  Siddha asserts that Felton "is charged with providing all religious communities with their religious rights under the law."  *Id*.  Notwithstanding that asserted duty, Siddha claims that Felton denied his request to be put on a Halal religious diet that includes a "meat protein source."  *Id*. at 4.  Siddha explains that the Kosher diet offered at MCIH provides a meat protein source, but only inmates who are a part of the "Jewish Communities" are permitted to be placed on that diet.  *Id*.  In Siddha's view, the denial of a Halal diet that includes meat is a "State-imposed restriction" that does not apply equally to all religious groups and is not based on a security or safety concern.  *Id*.  He cites the Inmate Handbook for MCIH which states: "No inmate shall be deprived or denied his right to participate [in] any

---

[1]  I have relied on the defendants' motion for full names, spellings, and titles of the defendants.

religious program already allowed, and the Religious Coordinator shall grant that request and Religious Freedom." *Id*.

Siddha alleges that the Religious Diet Program implemented by the State of Maryland's Division of Correction "intentionally put[s] significant pressure on inmates . . . to abandon their religious beliefs" and "imposes a substantial burden on [the inmate's] religious practice." ECF 1 at 6 (ellipses and brackets in original). He claims that the provision of a religious diet (*i.e.*, Kosher) that includes meat for Jewish inmates violates the Equal Protection Clause of the Fourteenth Amendment and results in depriving him of "a spiritual[ly] required diet 365 days a year." *Id*. Siddha concludes that "year after year" he has requested a Halal diet that includes a meat protein source similar to what is allowed on the Kosher diet, but he is continually refused. *Id*. at 7.

Siddha also claims that on December 11, 2020, Officer Wilson delivered mail to him in a brown paper bag that included legal mail. ECF 1 at 6. Pursuant to applicable policy, legal mail is only supposed to be opened in the presence of the inmate who is the intended recipient so that it can be checked for contraband. *Id*. at 6-7. Siddha claims that his attorney-client privilege was violated when his legal mail was opened outside of his presence. *Id*. at 7.

Plaintiff filed a complaint pursuant to the administrative remedy procedure. But, he claims that Partlow, who is the "ARP Coordinator" for MCIH, refused to investigate his claim and did not share any reports regarding the matter. *Id*.

Siddha contends that his constitutional right of access to the courts was violated as a result of the occurrence, and he claims that Partlow, the Warden, and the Commissioner of Correction "were fully aware" that his rights were violated but refused to acknowledge it. *Id*. Siddha adds that "Ms. Partlow used every means as ARP Coordinator to cover up any crime and violation reported to her" and that she stopped responding to his complaints. *Id*.

3

As relief, Siddha seeks compensatory and punitive damages.  ECF 1 at 8.  Additionally, he asks the court to order defendants to institute a Halal diet that includes a meat protein source.  *Id*.

### B.      Defendants' Response

Chaplain Felton recalls that he met with Siddha on or about December 7, 2020, concerning Siddha's request to participate in the Religious Diet Program at MCIH.  ECF 22-5 (Felton Decl.) at 1, ¶ 3.  He states that Siddha requested to be placed on a Kosher diet and he denied the request "pursuant to COMAR 12.03.02.03 and DPSCS Executive Directive Number OPS.160.0002" because Siddha's religious designation is not included in the faith groups eligible for the Kosher diet.  *Id*. at ¶¶3, 4.  Felton recalls that he offered Siddha placement on the Halal diet but Siddha refused the offer.  *Id*. at ¶ 4.

Scott Steininger, the Correctional Dietary Regional Manager for the Western Region, has been a Registered and Licensed Dietitian since 1980.  ECF 22-6 (Steininger Decl.) at 2, ¶ 1.  In his Declaration, Steininger provides the history of the Religious Diet program.  ECF 22-6 at 2-6.  He has also submitted several exhibits to support his factual recitation.  *Id.* at 7-82.

Steininger states that "before the establishment of a formal religious diet program, the regular diet was modified to exclude pork and pork products to eliminate one menu component that was offensive to certain religious groups such as the Muslim and Jewish communities."  *Id*. at 2, ¶ 3.  The "lacto-ovo vegetarian diet" is a vegetarian diet that "was intended to appeal to religious groups such as the various Islamic faiths, Hinduism, Jainism, Buddhism, Sikhism, Seventh Day Adventist, and others."  *Id*.  Protein is sourced from soy, nuts, legumes, eggs, and dairy products. *Id*. at 3, ¶ 6.

The Religious Diet Program was subsequently developed, as reflected in the Code of Maryland Regulations ("COMAR").  *See*, *e.g.*, COMAR 12.03.02.03.  It is administered through

the Department of Public Safety and Correctional Services ("DPSCS") Religious Services and Food Services, with the goal of conforming with minimum nutritional standards established by the Academy of Nutrition and Dietetics and providing reasonable accommodations for religious diets. ECF 22-6 at 3, ¶ 5.  The Religious Diet Program "provides two platforms based upon the lacto-ovo vegetarian diet: the Halal diet and the Kosher diet." *Id.* at 2, ¶ 4. He adds, *id.*:  "These diets each have specific requirements established under COMAR" 12.03.02.11.  Inmate participation is subject to request and approval.  *Id.*; *see* COMAR 12.03.02.04 *et seq.*

Steininger points out that the lacto-ovo diet meets "varied religious dietary needs" and, without this option, "a religious inmate might abstain from eating a meat entrée [from the regular diet menu] and be left with only side dishes." *Id.* at 3, ¶ 6. Notably, the lacto-ovo diet was certified Halal by the Islamic Society of the Washington Area in 2011 and in 1995 it was found to be Halal by imams employed by the DPSCS.  *Id.* at ¶ 7.

Steininger recalls that "DPSCS conducted a feasibility study in June of 1993, exploring availability and costs of Halal meat and other practical matters which would result from providing Halal meat, such as the need for additional kitchen space and storage space to keep the meats separate from non-Halal meat and the need for additional staffing and training."  ECF 22-6 at 4, ¶ 9.  In a Declaration of Richard West (ECF 22-6 at 9-13), provided on January 24, 2012, in connection with the case of *Turner-Bey v. Maynard, et al.*, Civil Action JFM-10-2816 (D. Md.),[2] West, then the Director of Correctional Food Services for the Division of Correction, averred that the additional estimated annual cost of providing Halal meats was $6,344,635.00.  ECF 22-6 at 4, ¶ 9.

---

[2] Mr. West's Declaration is docketed at ECF 46-5 in Civil Action JFM-10-2816 and is also attached as an exhibit to Steininger's Declaration, at ECF 22-6 at 9-13.

According to the feasibility study conducted by DPSCS, "providing Halal meat would be cost-prohibitive" and, in addition, it would require physical space that was not available.  Notably, Steininger avers that DPSCS currently faces "the same barriers to providing Halal and Kosher meats to inmates" as was determined in 1993 and 2012, because the "available physical space for dedicated food preparation and storage has remained largely the same."  *Id*. at ¶ 10.

Steininger explains that the average cost of meals per inmate per year was somewhat higher in fiscal year (FY) 2021 than typical.  ECF 22-6 at 4, ¶ 11.  Without calculating any of the enhanced costs associated with the COVID-19 pandemic, the costs for the different diets per inmate per day are as follows: "Regular diet $3.13/inmate/day, Lacto-Ovo Vegetarian diet $3.99/inmate/day (including religious and non-religious participant inmates), Medical diet $3.92/inmate/day, and Religious/Kosher diet $3.84/inmate/day."  *Id*.  Steininger states that he investigated the cost of offering a meal with Halal meat in the Western Region and concluded it would cost $6.40/inmate/day or double the amount for a regular diet and "more than a 60% cost increase over the Lacto-Ovo Vegetarian diet."  *Id*.  And, these sums are for food only, exclusive of the costs for "equipment and manpower."  *Id.*

In addition to the added costs of Halal meats, Steininger points out that staffing and security present "significant barriers to providing Halal and Kosher meat at DPSCS facilities."  ECF 22-6 at 5, ¶ 13.  Specifically, most correctional kitchens are staffed by a combination of employees and inmate workers.  *Id*.  Training and oversight to ensure that religious meats are properly stored and prepared would be required as well as additional security to prevent theft of the food meant for Halal diet adherents.  *Id*.  Currently, the DPSCS has vacancies for Correctional Dietary Officers across the State; providing Halal and Kosher meats to inmates would require additional staffing "above the currently-authorized number of positions."  *Id*.

Of import, Steininger explains, ECF 22-6 at 5, ¶ 12 (emphasis supplied):

> For clarity, please note that the Religious diet menu is for the Kosher diet, while the Halal diet is identical to the Lacto-Ovo Vegetarian diet. *The Kosher diet is also based on the lacto-ovo diet and does not include poultry or meat*. The Kosher diet permits tuna approximately two to three times per week. Although the Kosher menu lists chicken ala king, beef with rice and vegetables, and another chicken entrée, these items are prepared entirely with vegetarian substitutes for chicken and beef – *no actual chicken or beef is available on the Kosher diet plan*.

Steininger notes that tuna, which is offered on the Kosher diet, is not Halal according to dietary guidelines published in a 1967 book titled *How to Eat to Live* by Nation of Islam Leader Elijah Muhammad. *Id*. at 6, ¶ 16. Further, the Halal diet is designed to satisfy requirements of all eligible faith groups, such as Shi'ite, Sunni, Nation of Islam, Moorish Science Temple, and other recognized religions that have the same basic tenets requiring a Halal diet. *Id*.

In addition, Steininger observes that any "perception of preferential treatment of any group of inmates – Jewish, Muslim, or otherwise – can jeopardize institutional security and cause conflict among inmates." ECF 22-6 at 5, ¶ 14. The differences that exist between Kosher and Halal diets are "consistent with the underlying religious diet differences between Judaism and Islam." *Id*. According to Steininger, "building the religious diets upon the Lacto-ovo platform continues to be the least restrictive means to provide balanced nutrition to all inmates, regardless of religious designation" and "facilitates the best possible level of security compared to any alternatives." *Id*.

A copy of the Lacto-Ovo Vegetarian Diet is appended to Steininger's Declaration. *See* ECF 22-6 at 26-27. The protein provided by the diet is 90 to 105 grams per day. *Id*. at 26. The "meat equivalents" that are listed are cheese, eggs, dried beans and peas, lentils, peanut butter, nuts, seeds, meat analogues, yogurt, and tofu. *Id*.

Additionally, the Declaration provided by the expert witness, Brannon Wheeler, Ph.D., retained for Civil Action JFM-10-2816, states in pertinent part, ECF 22-6 at 40:

The prohibition against eating certain types of meat is based upon Q 5:3. Some legal authorities forbid the eating of all carnivores, and others disallow only the eating of predatory animals including all birds with talons and mammals with fangs.  Based on the exegesis of Q 4-5, some jurists allow the eating only of those animals whose meat is know[n] for its good flavor.  Carrion-eating animals, including specific birds, are not allowed to be eaten.  Certain animals, such as the fox and hyena, are not always classified as predatory or carrion-eating, and thus some jurists allow the eating of their meat.

Particular animals are forbidden to be eaten because of specific prohibitions made on account of the animals' being mentioned favorably in the Quran and its exegesis (e.g., bees, ants, frogs, hoopoe birds).  Many authorities do not permit the eating of lizards, certain snakes, and vermin of any type. Hanafi jurists do not allow the eating of domesticated donkeys and mules; some Hanafis consider horse meat reprehensible but allow the eating of rabbits. Shafi'is and Hanabalis permit the eating of horse meat and all but the Hanbalis prohibit the eating of domesticated ass.  The eating of dogs and cats is forbidden, and the eating of primates is generally prohibited because of their resemblance to humans.

Further, Dr. Wheeler states that in the Islamic faith a "number of sources explain that the greatest prophets and early exemplars of religious piety consumed a meat-free, vegetarian diet."  *Id*. at 44.

As to Siddha's claim regarding his legal mail, defendants dispute that plaintiff's mail was improperly handled when Officer Wilson delivered a paper bag full of mail to plaintiff on December 11, 2020, which allegedly contained legal and non-legal mail.  The legal mail logs for MCIH pertaining to December 10 and 11, 2020, have no notation that legal mail arrived that day for Siddha.  ECF 22-4 at 123-24.

Moreover, defendants point to an incident involving a large envelope addressed to Siddha with "Legal Mail" handwritten across it.  *Id.* at 126, 128.  But, when the return address was checked, it was determined to be the address of a home with no indication that it was also a law office.  *Id*. at 126-128.

8

## II.      NON-DISPOSITIVE MOTIONS

Siddha filed two motions for injunctive and mandamus relief (ECF 15 and ECF 25) as well as a motion to strike defendants' motion for extension of time.  ECF 24.

### A.      Injunctive and Mandamus Relief

In his first motion for "emergency permanent injunction" Siddha states there is a reasonable likelihood he will prevail on the merits of his claim concerning the manner in which Halal diets are provided and claims that "for more than a year, defendants have denied plaintiff any opportunity to exercise his First Amendment" right to freely exercise his religion.  ECF 15 at 1. Further, he claims that there is a substantial threat of irreparable harm if this court does not grant an injunction requiring defendants to provide Halal meats as the protein source for Halal diets.  *Id*. at 2.  That irreparable harm, in Siddha's view, is the prohibition against the free exercise of his religious faith by depriving him of a Halal diet.  *Id*.  Siddha adds that he has been denied due process because there was no avenue available to him to appeal the rejection of his request to be placed on a Halal diet that includes a meat protein source "equal to that of Kosher meat protein source."  *Id*.  And, Siddha claims that the deprivation of the opportunity to freely practice his religion amounts to an irreparable harm and that Chaplain Felton told him that he will never receive a Halal meat protein diet, only vegetarian.  *Id*. at 3.

In his second motion for "Mandatory Injunction And Civil Mandamus," Siddha provides a proposed order for a hearing that requires defendants to show cause why the Jewish communities are singled out for special treatment, *i.e.*, Kosher meals that include a meat protein source.  ECF 25 at 1.  Siddha also includes a list of requirements for various officials to ensure that Halal diets are certified under an appropriate authority; ensure the diet meets or exceeds minimum daily nutritional needs; and ensure correctional dietary managers are using the Halal symbol correctly.

*Id*. at 2. And, Siddha seeks an order requiring defendants to provide him with a "Halal protein-meat source diet" equivalent to the Kosher meat that is provided to the Jewish inmates. *Id*. at 4.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be."). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). In 18 U.S.C. § 3626(a)(2), it states:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

Siddha has not demonstrated that he is entitled to injunctive relief. Although Siddha believes that the Islamic prison community is being denied a religious diet that includes meat, while the Jewish community is receiving a religious diet that includes meat, the objective evidence produced by defendants establishes that Siddha is mistaken. Siddha has not disputed that the lacto-ovo diet is certified Halal, nor has he attempted to explain why a vegetarian diet certified Halal is not in keeping with the tenets of his faith. Further, the public interest at issue here is avoiding the prohibitive costs and other challenges associated with Siddha's assertion that Halal meat is required by his religious faith.

To the extent that Siddha seeks injunctive or mandamus relief against any of the defendants, his claim also fails. Under 28 U.S.C. § 1361, the federal district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or one of its agencies to perform a duty owed to a petitioner. In order to meet the requirements for mandamus relief, a petitioner must show that he has the clear legal right to the relief sought; that the respondent has a clear legal duty to perform the particular acts requested; and that no other adequate remedy is available. *See In re First Fed. Savings and Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988); *Asare v. Ferro*, 999 F. Supp. 657, 659 (D. Md. 1998). The failure to show any of these prerequisites defeats a district court's jurisdiction under 28 U.S.C. § 1361. *See National Association of Government Employees v. Federal Labor Relations Authority*, 830 F. Supp. 889, 898 (E.D. Va. 1993).

Given that Siddha's claim that Islamic inmates are treated unfavorably as compared to Jewish inmates is directed to State defendants, and is based on a misunderstanding of what is included in the Kosher diet, he is not likely to succeed in this matter. Accordingly, Siddha's motions for injunctive and mandamus relief are denied.

11

### B.      Motion to Strike

Siddha seeks to strike defendants' motion for extension of time, which they filed on February 25, 2022, seeking an extension to March 4, 2022.  ECF 24 (motion to strike); ECF 20 (motion for extension of time).  This court granted the motion for extension of time in an order dated February 28, 2022.  ECF 21.  Siddha argues that defendants' motion amounts to a disregard for this court's directive to answer or otherwise respond to the Complaint and prolongs the time during which he contends he is not permitted to practice his religion.  ECF 24 at 1-2.

Under Fed. R. Civ. Proc. 12(f) this court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  A motion for extension of time does not fall under any of the categories listed in Rule 12(f).  Additionally, the Order issued by this court directing service of the Complaint includes a paragraph permitting defendants to seek additional time to file a response to the Complaint, beyond the 60 days permitted by this court's standing order.  ECF 6 at 3, ¶ 17.[3]  Siddha's motion to strike is denied.

### III.     STANDARD OF REVIEW

### A.

Because Siddha is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346

---

[3] *In re State Prisoner Litigation*, Misc. No. 00-308 Standing Order 2012-01 (D. Md. 2012).

F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## B.

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  *See* ECF 22.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert

the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*. at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*. at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv.*

*Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom*. *Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion

when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Siddha has not filed an affidavit under Rule 56(d).  I am satisfied that it is appropriate to address the motion as a motion to dismiss for certain defendants, and as one for summary judgment as to others, as this will facilitate resolution of this case.

## C.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Services Bd.,* 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young,* 569 U.S. 221 (2013); *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  A

Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Twombly*, 550 U.S. at 555-56.

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . .");  *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing'" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

17

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co*., 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin*., 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc*., 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington County*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the

complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg. v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows. Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, __F. App'x__, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 882 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Goines*, 882 F.3d at 165. But, "in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* at 167.

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S.__, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire*

*Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## D.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Market Development Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").  The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support the factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials...."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by citing to evidence in the record.  And, "the burden on the moving party may

[also] be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact." *Brother Convenience Store, Inc. v. U.S. Dep't of Agriculture*, GLR-20-1346, 2021 WL 3911594, at *8 (D. Md. Sept. 1, 2021) (citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87). Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including any reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841

F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations.   *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### E.

The Complaint appears to be an action brought under 42 U.S.C.  § 1983, alleging constitutional violations, including under the Frist Amendment, the Fourteenth Amendment, and

the Equal Protection Clause.  ECF 1 at 5, 6, 7.  Plaintiff states, *id.* at 7:  "It is my intention to pursue § 1983 claims against the defendants . . . ."

Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Notably, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.  The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims,

'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . .; § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

(1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813(1994); *see also Wilcox*, 877 F.3d at 170.

## IV.   DISCUSSION

### A.   Eleventh Amendment Immunity

Siddha provides no statement regarding whether the defendants were sued in their official or individual capacity.  ECF 1.  Defendants argue that any claim Siddha raises against them in their official capacity is barred by the Eleventh Amendment.  ECF 22-1 at 13-14.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  U.S. Const. amend XI.  The Eleventh Amendment did not create sovereign immunity.  Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union.  *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities[.]"  *Fed. Mar. Comm'n v. S.C. State Ports Auth*., 535 U.S. 743, 760 (2002).

States enjoy immunity from suits brought in federal court by their own citizens, even though the text of the Eleventh Amendment does not explicitly address such a scenario.  *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S.

26

356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). In other words, under the Eleventh Amendment, a private individual is barred from bringing a suit against a state in federal court to recover damages, unless an exception to sovereign immunity applies. *See Coleman v. Ct. of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)).

Sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," absent waiver or a valid congressional abrogation of sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); M*cCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

Under the Eleventh Amendment, damages claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity.  This is because such a suit

against the state actor is tantamount to a suit against the state itself.  *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

There are, however, three exceptions to the Eleventh Amendment's prohibition of a suit against a state or an arm of the state.  *In Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . .  Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. Frew ex rel. *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . .  Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

The State of Maryland has not waived immunity for claims brought pursuant to § 1983. Additionally, Siddha is not entitled to injunctive relief, as explained.  To the extent the individual defendants are sued in their official capacities, they are immune from suit for monetary damages under 42 U.S.C. § 1983.

## B.      Exhaustion of Administrative Remedies

Defendants raise the affirmative defense that Siddha has failed to properly exhaust administrative remedies in connection with his claim regarding a Halal diet.  ECF 22-1 at 17. Siddha appears to assert in his opposition that he was unable to exhaust administrative remedies for his religious diet claim because his "legal mail containing vital information and/or legal documents was met with sabotage, stolen and destroyed" and Partlow obstructed his use of the administrative remedy procedure.  ECF 26 at 9.

If Siddha's religious diet claim has not been properly presented through the administrative remedy procedure it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.  The PLRA provides, in pertinent part, 42 U.S.C. § 1997e(a):

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).[4]

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust

---

[4] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'"  *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted).  Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'"  *Id.* at 651, 898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC.  *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code Ann. Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy.  *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007).  On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers.  *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017).

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 578 U.S. at 639 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

The Maryland Department of Public Safety and Correctional Services has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Corr. Servs. Article ("C.S."), §§ 10-201 *et seq*.; COMAR 12.07.01B(1) (defining ARP). The grievance procedure applies to the

submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(7). "A court may not consider an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies" set forth in C.S. Title 10, Subtitle 2. C.S. § 10-210(a).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established administrative remedy procedure process that applies to all Maryland prisons. COMAR 12.07.01.05B 2.28.01. Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on

which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later.  COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame.  The prisoner has 30 days to file an appeal to the Commissioner of Correction.  COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[5]  COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing."  C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings.  *See* C.S. § 10-208; COMAR 12.07.01.07-.08.  The conduct of such hearings is governed by statute.  *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1).

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.  C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2).  However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes

---

[5] If the Commissioner fails to respond, the grievant shall file his appeal within 30 days of the date the response was due.  COMAR 12.07.01.05(B)(2).

a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* COMAR 12.07.01.10(B); C.S. § 10-209(b)(2)(c).

The final agency determination is subject to judicial review in a Maryland State court, so long as the claimant has exhausted his remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The ARP process applies to the majority of inmate complaints, including allegations that correctional officers used excessive force. COMAR 12.02.28.04(A)(7). Filing a complaint with the DOC's Intelligence and Investigative Division does not count as an administrative remedy and does not excuse the inmate from pursuing the administrative remedy process. COMAR 12.02.28.05(H).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 635. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 636. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008).

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if

33

possible, before bringing suit.  *See Chase*, 286 F. Supp. 2d at 529-30.  As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions.  *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.  *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id*. at 643-44.  The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 644.

Siddha's vague claim that his legal mail was destroyed or misdirected and that somehow this led to his failure to exhaust his religious diet claim is not a sufficient excuse for failing to properly exhaust the claim.  Additionally, it is contradicted by his ability to appeal his legal mail claim to the IGO.  *See* ECF 22-7 at 3-24.

Defendants have produced evidence that Siddha failed to pursue his ARP with the IGO. Those verified documents reveal that on January 21, 2021, Siddha filed an ARP (MCIH-0370-20) regarding "religious meals."  ECF 22-8 at 2.  The Commissioner of Correction, defendant Annie

Harvey, denied Siddha's appeal of the Warden's response on May 4, 2021.  *Id*. at 4.  A full investigation into Siddha's ARP complaint was conducted at the institutional level and by the Commissioner's office.  *See id.* at 9-14; 42.  Despite taking those steps, Siddha did not file a complaint with the IGO.  ECF 22-7 (Decl. F. Todd Taylor, Jr., IGO Director), at 1-2.

Defendants also assert that Siddha's legal mail claim was not properly exhausted because he failed to resubmit his complaint with evidence of his claims, such as a description of the legal mail that Siddha claims was improperly handled.  ECF 22-1 at 15; ECF 22-4 at 86-95.  However, Siddha claimed in his appeal of the dismissal of his ARP that Ms. Partlow refused to give him a copy of the ARP she dismissed for procedural reasons.  ECF 22-4 at 92 ("Note" below signature line).  Additionally, Siddha provided a description of the legal documents contained in the paper bag given to him by Officer Wilson in his resubmitted ARP.  *Id*. at 94.  To the extent that Siddha was not given a fair chance to fully present this claim, I conclude that the ARP process was unavailable to Siddha.  Therefore, I shall consider the mail claim as exhausted.

In contrast, Siddha's religious diet claim is unexhausted and thus subject to dismissal, without prejudice.  However, even if this claim had been exhausted, it has no merit, as discussed, *infra*.

## C.    Personal Participation

Siddha names Governor Hogan as a defendant.  But, he alleges little more than Hogan's awareness of Maryland laws, regulations, and/or policies that, in Siddha's view, have created an unconstitutional burden on his right to freely exercise his religious beliefs.  ECF 1 at 5.

As discussed, liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption, there are no specific allegations against Governor Hogan

beyond a generalized awareness of State law.  The Complaint must be dismissed against Governor Hogan.

### D.     Supervisory Liability

Siddha's claims against Warden Werner and Commissioner Harvey are premised on his belief that they are aware of the practices in place regarding religious diets but have done nothing to correct the situation.  Siddha imputes this knowledge to Werner and Harvey by virtue of their participation in processing the ARPs he filed.  ECF 1 at 5.  Additionally, Siddha's claim against ARP Coordinator Partlow is based on his assertion that she did not investigate his ARP complaints concerning his legal mail as he maintains is required by applicable regulations.  *Id*. at 7.

As noted, the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983).[6]  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard*, 268 F.3d at 235 (quoting *Slakan*, 737 F.2d at 372).

Depending on the posture of the case, supervisory liability under § 1983 must be supported either with factual allegations or with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's

---

[6]  Respondeat superior is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee.  *See Black's Law Dictionary* (8th ed. 2004).

inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw*, 13 F.3d at 799.

Decisions made during the administrative grievance do not alone establish liability.  *Whittington*

*v. Ortiz,* 307 Fed. Appx. 179, 193 (10th Cir. 2009) (stating that "denial of the grievances alone is

insufficient to establish personal participation in the alleged constitutional violations."); *Gallagher*

*v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped"

grievances was not enough to establish personal participation).

Siddha fails to state claims against Werner and Harvey.  His suit is subject to dismissal as

to them.

### E.     Religious Diet Program

Prison inmates retain a right to reasonable opportunities for free exercise of religious

beliefs without concern for the possibility of punishment.  *See Cruz v. Beto*, 405 U.S. 319, 322

(1972).  However, that right is not unfettered.  Indeed, "[l]awful incarceration brings about the

necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348

(1987).  Prison restrictions that impact on the free exercise of religion, but which are related to

legitimate penological objectives, do not run afoul of the Constitution.  *See Turner v. Safely*, 482

U.S. 78, 89-91 (1987).

As a threshold matter, to state a claim for violation of rights under the Free Exercise

Clause, Siddha must allege that: (1) he holds a sincere religious belief; and (2) a prison practice

or policy places a substantial burden on his ability to practice his religion.  *See Wilcox v.*

*Brown*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,

450 U.S. 707, 718 (1981)).  A substantial burden is placed upon a prisoner's religious exercise

when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his

beliefs." *Thomas*, 450 U.S. at 718.  But, as indicated, prison restrictions that impact on the free exercise of religion, but which are related to legitimate penological objectives do not run afoul of the constitution.  *See Safely*, 482 U.S. at 89-91.

Siddha alleges that Chaplain Felton told him if he wanted to receive a religious diet he would have to convert to Judaism.  ECF 26 at 9 ("in order . . . to receive a meat protein religious diet, [Siddha] was offered to change his religious preference . . .").  This allegation, however, finds no support in the record before the court.  Chaplain Felton apparently understood Siddha's request to be that he wanted to be placed on a Kosher diet and, with that understanding, Felton denied the request because Siddha is not Jewish.  Had Siddha presented his request, as he does in this complaint, as an allegation that Jewish inmates are provided a diet that differs fundamentally from a Halal diet, there is ample evidence to support a denial of his request.

Plaintiff's understanding of what is included on the Kosher diet is incorrect.  There is no Kosher meat provided to adherents of that diet.  ECF 22-6 at 5, ¶ 12.  While minor differences between the two diets exist, those differences are consistent with the underlying religious beliefs in Judaism and Islam.  *Id*. at ¶ 14.  Moreover, there are legitimate penological objectives supporting the development of vegetarian diets for Halal and Kosher meals: the cost of the food, security, added storage, and additional training is prohibitive.  *Id*. at 4-5, ¶¶ 11, 13.  When balancing the added costs and need for additional staff with the assertion that the Islamic faith does not *require* adherents to follow a vegetarian diet but the vegetarian diet is certified Halal, it is clear that Siddha's religious beliefs and practices have not been unconstitutionally burdened. *See DeJesus v. Bradt*, 174 F.Supp.3d 777, 785-87 (W.D.N.Y. 2016) (finding no substantial burden to religious practice under the First Amendment where Plaintiff had access to food stored in his cell); *Evans v. Snyder*, 2014 WL 1369301, at *4 (W.D. Mich. March 31, 2014)(holding that the

plaintiff was not denied participation in fast and that denial of snack bag during fasting days was at most an inconvenience, particularly given that the plaintiff had the opportunity to purchase his own food or snacks form the prison store.).

Another member of this court has considered the Halal meat claim previously. *Turner-Bey v. Maynard, et al.*, Civ Action JFM-10-2816, 2012 WL 4327282, *8 (D. Md. 2012). Judge Motz rejected the claim that the failure to include ritually slaughtered meat for either group does not violate the free exercise clause of the First Amendment. *Id*. at *8-9.

> Plaintiff also claims defendants' failure to provide him a "religious diet" violates the Free Exercise Clause, applicable to the states by virtue of the Fourteenth Amendment, *see Employment Division v. Smith*, 494 U.S. 872 (1990), which provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. 1. A prisoner, however, does not enjoy the full range of freedoms as those not incarcerated; rather, state action violates a prisoner's constitutional rights if it burdens a prisoner's religious rights and is not reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987); accord *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). Here, the denial of ritually slaughtered meat to both Jewish and Muslim prisoners is directly related to prison security (to prevent tension caused by the perception that different groups are treated differently), and is also related to cost, both with regard to the purchase of religiously slaughtered meat and to the cost of retrofitting food preparation and storage facilities and providing additional staff to keep such foods separate.

> The kosher diet (provided Jewish prisoners) is labeled "religious" and the lacto-ovo diet (provided those with health problems and vegetarians as well as prisoners of various faiths. including Islam) is labeled "medical." As noted, the distinction is one of semantics; the facts show that the diets were designed to provide religious accommodation within the parameters dictated by prison management necessities. *See* ECF No. 22, Lacto-ovo vegetarian diet, Medical Diet Manual Appendix 2. Kosher requirements, including special meal preparation and the eating of specific foods, must be followed for certain segments of the Jewish prison population, while halal requirements can be met using the lacto-ovo diet, provided that fasting during daylight hours and additional foods such as fruit be permitted during the month of Ramadan, nothing more is constitutionally required.

> Plaintiff must show that his claims are rooted in religious belief and not in "purely secular" concerns. *See Wisconsin v. Yoder*, 406 U.S. 205, 215, 216 (1972). It is well settled that "religious beliefs need not be acceptable, logical,

consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. Ind. Empl. Sec. Div.* 450 U.S. 707, 714(1981). However, beliefs which are philosophical and personal, rather than religious, do not rise to the demand of the religion clause. *See Yoder*, 406 U.S. at 205. As noted above, plaintiff offers no evidence that eating ritually slaughtered meat is a tenet of his religion and not a purely secular concern arising out of (1) his mistaken belief that Jewish prisoners are afforded ritually-slaughtered meat denied to Muslims, and (2) his contention that the religious diet developed for Jewish prisoners who keep kosher diets demonstrates favoritism toward that group. He has failed to show that his free exercise rights are substantially burdened.

Siddha's claim does not differ from the claim raised in *Turner-Bey*.  And, for the same reasons noted by this court in 2012, Siddha's free exercise claim fails.

To the extent that Siddha invokes the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, the religious diet claim also fails under that statutory scheme.  In relevant part, RLUIPA provides, 42 U.S.C. §2000cc-1(a):

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

To be sure, "Congress has specifically reaffirmed the First Amendment rights of inmates to the exercise of religion in prison with the enactment" of  RLUIPA.  *Faver v. Clarke*, 24 F.4th 954, 959 (4th Cir. 2022).  RLUIPA assures religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated.  *See Cutter v. Wilkinson*, 544 U.S. 709, 715-17 (2005).

Under RLUIPA, no government may "impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government

demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest . . . [and] is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000 cc-1(a).  But, as the Fourth Circuit has explained, the "compelling governmental interest" clause "must be read to accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  *Faver*, 24 F.4th at 960 (citation omitted); *see Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019).

The Act "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015).  A prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," then the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means."  *Id.*  A prison regulation imposes a substantial burden when it forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand."  *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (brackets in original); *see Couch v. Jabe*, 679 F.3d 197, 199 (4th Cir. 2012) (a prisoner whose religious beliefs required the growth of a one-inch beard stated a claim under RLUIPA when he challenged a prison policy forbidding facial hair which resulted in the loss of benefits for non-compliance and reinstatement of benefits with compliance).

The choice between practicing one's religion and compliance with the challenged regulation must, however, be clear.  In *Incumaa*, 791 F.3d 517, the prisoner plaintiff maintained that prison officials required his renunciation of his chosen religion in order to be reassigned to the general population and not subjected to the stricter, more harsh conditions of segregation.  But,

evidence that prison officials allowed general population prisoners to maintain their affiliation with the religious group and that the plaintiff was permitted to keep religious materials in his possession while segregated undermined his claim that the goal of his segregated confinement was to force his renunciation. *See Incumaa*, 791 F.3d at 526. No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Siddha's "choice" is self-imposed; there is an available Halal-approved Lacto-ovo diet, which he has declined to follow. This does not amount to a choice between observing sincerely held religious beliefs or abandonment of those beliefs. As observed by Judge Motz in *Turner-Bey*, "plaintiff is not asked to choose between a religious precept or depriving himself of adequate nutrition; an alternative meat-free diet is available that is acceptable under Islamic law." *Turner-Bey*, 2012 WL 4327282, *8. RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "'due deference to the experience and expertise of prison and jail administrators.'" *Lovelace*, 472 F.3d at 210 (quoting *Cutter*, 544 U.S. at 723). Accordingly, as to this claim, Chaplain Felton is entitled to summary judgment in his favor.

## E.     Equal Protection Claim

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). In cases where no suspect criterion is involved, such as race, the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989). To show a violation of equal protection, a plaintiff must demonstrate that he was treated differently than

42

similarly situated inmates and the discrimination was intentional or purposeful.  *See Williams v. Bitner*, 307 Fed. App'x. 609, 611 (3d Cir. 2009) (citing *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)).  Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause . . . .  must still be analyzed in light of the special security and management concerns in the prison system."[7]  *Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2001) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.").

Siddha's equal protection claim is grounded in a mistaken belief that Jewish inmates are provided ritually slaughtered meat as a part of the Kosher diet where Muslim inmates are not provided Halal meat.  The differences between the Kosher diet and the Lacto-ovo diet offered to Muslims is, however, much more subtle than what Siddha believes.  Judge Motz's rationale rejecting the equal protection claim raised in *Turner-Bey* is applicable here, 2012 WL 4327282, at *10:

> The "differences" in treatment between Jewish and Muslim prisoners arises not out of defendants' intentional discriminatory acts: rather, kosher Jewish diet demands certain food preparation and food choices not required for Muslims who seek a halal diet. Neither group receives ritually slaughtered meat; both diets are centered around a lacto-ovo vegetarian diet. While the two diets are not the same, the needs of both religious groups are accommodated.[] The kosher diet is outlined as a "religious diet" in DOC regulations; the lacto-ovo diet is outlined in the DOC's regulations as a "medical diet." While this fact may have created some impetus for this lawsuit, the names applied to the two diets is but

---

[7] A prisoner's rights under the Constitution must not be inconsistent with his status as a prisoner.  *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984).  Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest.  *See Thornburgh v. Abbott*, 490 U.S. 401, 409-10 (1989).

a difference without distinction.  No discriminatory animus is shown, and this claim fails as a matter of law.

Likewise, Felton is entitled to summary judgment on this claim.

## F.    Access to Courts Claim

Plaintiff claims that his legal mail was improperly handled.  Further, Siddha summarily asserts that his access to courts was denied because Officer Wilson delivered a paper bag full of mail to Siddha that also contained "legal mail."  ECF 1 at 6-7; ECF 26 at 8.

Applicable DPSCS regulations require that legal mail must be opened in the presence of the inmate-addressee.  *See* COMAR 12.02.20.02(F).  Siddha asserts that this was not done on December 11, 2020, and he names Wilson as a defendant because he is the officer who delivered the mail to plaintiff's cell.  Moreover, as to Partlow, the ARP Coordinator, Siddha contends that she failed to investigate his ARP complaints, as required by appliable regulations.  ECF 1 at 7.

Prisoners have a constitutionally protected right to send and receive mail.  *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Moorehead v. Keller*, 845 F. Supp. 2d 689, 692 (W.D.N.C. 2012).  The interference by prison officials with certain types of mail may state a constitutional claim.  But, occasional incidents of delay or non-delivery of mail do not rise to a constitutional level.  *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997); *Smith v. Mashner*, 899 F.2d 940, 944 (10th Cir. 1990).

"[P]olicies concerning legal mail require heightened scrutiny, but isolated incidents of mishandling of mail do not state a claim."  *Barnes v. Wilson*, 110 F. Supp. 3d 624, 632 (D. Md. 2015); *accord Buie v. Jones*, 717 F.2d 925, 926 (4th Cir.1983).  "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement

before the courts.'"  *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)).

There is no assertion by Siddha that he suffered an actual injury (such as a missed legal deadline or retaliatory conduct) as a result of the mishandling of his legal mail.  Therefore, his Complaint fails to state a claim upon which relief may be granted.  Moreover, the prison records do not show that plaintiff received legal mail on either December 10 or December 11 of 2020.  ECF 22-4 at 123-24.  Defendants have also shown that another piece of mail for Siddha said it was "Legal Mail," but when a prison official sought to verify the source, it was found to have a return address for a home, not a law office.  ECF 22-4 at 126-29.

Because Siddha has not alleged that the conduct complained of caused him to suffer a cognizable injury, this entitles Wilson and Partlow to a dismissal of the claim.  Alternatively, they would be entitled to summary judgment on the claim, because they have shown, without dispute, that plaintiff did not receive mail on the date he claims.

Siddha's reliance on an alleged violation of prison policy also does not suffice.  A violation of prison policy alone does not state a Fourteenth Amendment due process violation against any of the defendants.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*).

## V.    CONCLUSION

For the reasons stated herein and by separate Order which follows, defendants' Motion is GRANTED.  Siddha's motions for injunctive and mandamum relief and to strike are DENIED.


April 21, 2022                                                    /s/
Date                                                    Ellen L. Hollander
                                                    United States District Judge